FILED

2008 Oct-30  PM 01:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **WILLIAM SCOTT,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 4:07-CV-2166-VEH** |
| | ) |
| **THE PRUDENTIAL INSURANCE** | ) |
| **COMPANY OF AMERICA,** | ) |
| | ) |
| **Defendant.** | ) |

_____

## MEMORANDUM OPINION

## I.    INTRODUCTION

Before the court are cross-motions for summary judgment on all claims by the plaintiff, William Scott ("Scott"), against the defendant, Prudential Insurance Company of America ("Prudential"). (Docs. 7, 11). The parties have filed briefs and submitted evidentiary materials in support of their positions. (Docs 8, 12-17). The motions are now ripe for decision by this Court.

The court has carefully considered the parties' arguments, and, for the reasons discussed in this Memorandum Opinion, Scott's Motion for Summary Judgment (Doc. 7) is due to be **DENIED**. Prudential's Motion for Summary Judgment (Doc. 11) is due to be **GRANTED**.

## II.   RELEVANT UNDISPUTED FACTS[1],[2]

Plaintiff, William Scott ("Scott"), worked for the Kardoes Rubber Company through May 19, 2004.  (Def's MSJ, AF No. 4; Pl's MSJ AAF No. 1).  He was employed in maintenance at the company, and his position required medium work.

---

[1] Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955); *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996).  The court will consider each motion independently, and in accordance with the Rule 56 standard.  *See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." *See* Wright, Miller & Kane, *Federal Practice and Procedure* § 2720, at 327-28 (3d ed. 1998).

These are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

[2] The designation "AF" stands for admitted fact and indicates a fact offered by the moving party that the non-movant has admitted in written submissions on summary judgment, or by virtue of any other evidence offered in support of the case.  Whenever the non-movant has adequately disputed a fact offered by the movant, the court has accepted the non-movant's version. In this case, both Plaintiff and Defendant have filed motions for summary judgment. The court's numbering of admitted facts (e.g., AF No. 1), therefore, corresponds to the numbering of the movant's Statement of Facts as set forth in Docs. # 8, 11 and responded to by the nonmovant in Docs. #12, 15.  To distinguish between admitted facts in Plaintiff's motion for summary judgment, and Defendant's motion for summary judgment, the court identifies which party's motion for summary judgment an admitted fact comes from (e.g., Def's MSJ, AF No. 1; Pl's MSJ, AF No. 1).

A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, (Def's MSJ, AF No. 5.2) would indicate the second sentence of paragraph 5 of Prudential's Statement of Facts is the subject of the court's citation to the record.  Similarly, the designation "AAF" stands for additional admitted fact and corresponds to the nonmovant's Statement of Facts contained in Doc. # 12 and responded to by the movant in Doc. #14.  Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

(Def's MSJ, Ex. 2).  As with all other Kardoes Rubber Company employees, Scott

was the beneficiary of a Long Term Disability ("LTD") plan, issued by the defendant,

Prudential Insurance Company of America ("Prudential").  (Def's MSJ, AF No. 1;

Pl's MSJ , AAF No. 2).

The summary plan description ("SPD") issued by Prudential defined disability

as follows:

> You are disabled when Prudential determines that:
>
> - You are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
> - You have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.
>
> After 24 Months of payments you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

(Def's MSJ, AF No. 3).

In addition to defining disability, the SPD provides a separate "ERISA

Statement" appended to the group certificate.  (Def's MSJ, Evidentiary Submission,

(Doc. 13, Ex. 1 at 32, PRU 000379).  An introduction to the ERISA Statement

expressly notes, "This ERISA Statement is not part of the Group Insurance

Certificate."  (Doc. 13, Ex. 1 at 30, PRU 000378).  The ERISA Statement also

outlines the general process for the administration of claims procedures and states in relevant part, "The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine the eligibility of benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious." *Id.*

Scott suffered from heart disease and had undergone triple bypass surgery in the past. (Pl's MSJ, AAF No. 1). As a result of his health problems, Scott applied for disability benefits on June 2, 2004. (Def's MSJ, AF No. 7; Pl's MSJ AAF No. 6). Prudential approved Scott's application for LTD benefits on September 23, 2004, and he began receiving payments on November 17, 2004. (Pl's MSJ, AF No. 1, Def's MSJ, AF No. 7). Under the initial definition of disability, Scott was disabled if he was unable to perform "the material and substantial duties" of his "regular occupation." (Pl's MSJ, AF No. 2). After twenty-four months, the definition of disability changed and required a determination as to whether Scott was unable to perform the duties of any "gainful occupation" for which he was "reasonably fitted by education, training or experience." *Id.*

On March 26, 2005, Scott submitted a Supplementary Claimant Statement to Prudential in which he indicated that he could perform daily activities such as "fishing" and "a little gardening;" Scott also indicated that he needed no assistance

in performing daily activities such as dressing, bathing, and caring for his hair.  (Pl's MSJ, AAF No. 8; Def's MSJ, AF No. 8).

Later, on May 6, 2005, Scott's cardiologist, Dr. Aikens, submitted a statement classifying him as Class III on the New York Heart Association's ("NYHA") scale[3] and indicating that he could lift up to ten pounds frequently and twenty pounds occasionally.  (Pl's MSJ, AF No. 2, AAF No. 9; Def's MSJ, AF No. 9).  Then, on July 3, 2006, Scott submitted an Activities of Daily Living Questionnaire to Prudential in which he indicated that he could perform a range of activities such as housework, grocery shopping, driving without assistance, and fishing.  (Pl's MSJ, AAF No. 10; Def's MSJ, AF No. 10).

In response, on August 1, 2006, Prudential requested medical records from Scott's physicians  so that it could determine whether payment of LTD benefits was appropriate.  (Pl's MSJ, AAF No. 11; Def's  MSJ, AF No. 11).

Denise Chase, a registered nurse and employee of Prudential, conducted a clinical review of all of Scott's medical records; she reached the conclusion that Scott's conditions would not limit him from performing "sustainable light work." (Pl's MSJ, AF No. 3, AAF No. 11; Def's MSJ, AF No. 11).   Additionally, Chase

_____

[3] The NYHA scale is a functional classification for prescription of physical activity for cardiac patients.  Level III on this scale indicates that a patient suffers from "marked limitation of activity,"such that the patient is only comfortable at rest.

questioned Dr. Aikens's determination that Scott met NYHA Class III requirements, since self-reporting by Scott did not indicate the "marked limitation of activity" required by the NYHA Class III standard, and since Dr. Aikens's conclusion that Scott could lift ten pounds occasionally and twenty pounds frequently conflicted with his NYHA Class III determination.  (Pl's MSJ, AF No. 3, AAF No. 12; Def's MSJ, AAF No. 4).

Prudential also consulted a Vocational Rehabilitation Specialist, Michael Chretien, who performed an "employability assessment," and determined that Scott was "expected to be reasonably employable," in several occupations for which he was qualified.  (Pl's MSJ, AAF No. 13; Def's MSJ, AF No 13).   These occupations included a Production Assembler, Sales Attendant, Security Guard, and Hand Packager.  *Id.*

Following these determinations, on November 16, 2006, Prudential wrote to Scott and notified him that it had completed a review of his claim for LTD benefits and had determined that he did not meet the "any gainful occupation" standard that he was required to meet after the initial twenty-four month period.  (Pl's MSJ, AF No. 3.1, AAF No. 14; Def's MSJ, AF No. 14).

Taking advantage of the administrative remedies provided by Prudential, Scott appealed the decision and hired his present attorney.  (Pl's MSJ, AAF No. 15; Def's

MSJ, AF No. 15). Scott then provided Prudential with additional claims of disability, namely, that he was disabled due to heart attack, diabetes, low back pain, and knee pain. (Pl's MSJ, AF No. 11).

Scott also submitted additional medical evidence to Prudential. Donna Cordes, a nurse who treated Scott, stated on March 3, 2007, that "due to increasing shortness of breath and congestive heart failure, it is my opinion that Mr. Scott is unable to work a full time job." (Pl's MSJ, AF No. 9).

Additionally, Scott submitted a Disability Questionnaire prepared by Dr. David Willis, who saw Scott from December 2006 until July 2007. (Pl's MSJ, Evidentiary Submission, Ex. 16). An accompanying letter from Scott's attorney states that Dr. Willis's records confirm that, "Mr. Scott is disabled due to heart disease, diabetes and COPD." *Id.*

Scott also submitted evidence from an endocrinologist who had treated him in the past. A nurse in this office, citing Scott's blood pressure and blood sugar specifically, indicated that "[Scott] has multiple medical problems that prevent him from working." (Pl's MSJ, AF No. 7).

Having received this additional evidence and with its final decision still pending, Prudential hired two independent medical doctors, Dr. Eldred Zobl, a specialist in cardiovascular disease, and Dr. Richard S. Kaplan, certified by the

7

American Board of Physical Medicine and Rehabilitation, to review Scott's medical records and make a recommendation. (Pl's MSJ, AF No. 12, AAF Nos. 16-17; Def's MSJ, AF Nos. 16-17).

Dr. Zobl concluded that Scott's impairment in cardiac function was not so severe as to prevent him from engaging in normal activities, and the only necessary limitation was that Scott should not lift more than twenty pounds at once. (Pl's MSJ, AAF No. 16; Def's MSJ, AF No. 16).  Dr. Zobl also provided a supplemental report stating that all of Scott's conditions "were under control and should not contribute at all to any functional impairment."  *Id.*

Dr. Kaplan evaluated Scott's records for physical impairment, due to the new claims of back and knee pain. He concluded that Scott had no "physiatric impairment" from any diagnosed musculoskeletal condition, that Scott's records revealed no prior treatment for any lower back or knee pain, and that he had never sought treatment for any chronic pain.  (Pl's MSJ, AAF No. 17; Def's MSJ, AF No. 17).

Based upon these determinations by both doctors and its previous conclusions, Prudential upheld its decision to terminate Scott's LTD benefits.  (Pl's MSJ, AF 1.2, AAF 18; Def's MSJ, AF 18).  Scott initiated this lawsuit shortly thereafter.

## III.   PROCEDURAL HISTORY

Scott initiated this case in the Circuit Court of Etowah County, Alabama. (Notice of Removal, Doc. 1, Ex. 1).  The one count complaint alleged that Prudential wrongfully terminated benefits in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829 (codified in scattered sections of 29 U.S.C. (2000)); specifically, Scott alleged violation of  29 U.S.C. § 1132.  (*Id.*).

On November 29, 2007, Prudential removed this case to federal court based on federal question jurisdiction.  (Doc. 1).  Prudential filed an answer, denying Scott's entitlement to benefits.  (Doc. 2).  Scott then filed the pending motion for summary judgment as to all issues on June 10, 2008. (Doc. 7).  Prudential filed its own motion for summary judgment  on July 15, 2008. (Doc. 11).

## IV.   STANDARD OF REVIEW[4]

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings,

---

[4] Although there are cross-motions for summary judgment filed by both parties pursuant to Rule 56, the Eleventh Circuit recently noted that, due to the peculiar standards of review for ERISA cases, Rule 56 practice may be unnecessary.  This is especially the case where, as here, the parties rely exclusively on the administrative record.  *See Doyle v. Liberty Life Assur. Co.*, No. 07-10348, 2008 WL 4272748 (11th Cir., Sept. 18, 2008).  Other district courts have similarly noted that the district court's role in an ERISA case is fundamentally different than its ordinary role as a trial court.  *See Providence v. Hartford Life & Accident Ins. Co.*, 357 F. Supp. 2d 1341, 1342 n.1 (M.D. Fla. 2005) ("[T]he Court's task is to review the benefit decision based on the administrative record available to the decision maker at the time he or she made the decision.").

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).

The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(c) requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)).  If the moving party bears the burden of proof at trial, then it can meet its burden on summary judgment only by presenting positive evidence that demonstrates the absence of a genuine issue of material fact; i.e., facts that would entitle it to a directed verdict if not controverted at trial.  *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for a directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of any evidence in the record in support of a judgment for the

11

nonmoving party on the issue in question.  This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the nonmoving party's case. *Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the nonmoving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## V.   ANALYSIS

### A.   Overview of ERISA Claims

ERISA § 502(a)(1)(B) provides a private right of action for beneficiaries under a covered plan to challenge a plan administrator's denial of benefits.  29 U.S.C. § 1132(a)(1)(B).  In order to take advantage of this private right of action, courts have imposed a requirement that plaintiffs exhaust the administrative remedies provided

to them by their plan administrator.  *See Mason v. Continental Group, Inc.*, 763 F.2d 1219 (11th Cir. 1985); JAMES F. JORDAN, ET AL, ERISA LITIGATION § 5:04[B][3][a] (3d ed. 2008).   There is no question that Scott has properly exhausted his administrative remedies.

When, as here, administrative remedies are properly exhausted and a beneficiary has sought review of the decision in federal court, ERISA provides no statutory standard of review under which a district court should scrutinize the administrative record.  In the absence of statutory standards of review, courts have applied judicially created ones.  Of particular importance to this case is the question of which standard is appropriate.

## B.   Applicable Standard of Review

The court first discusses the different levels of scrutiny the Eleventh Circuit has previously used in ERISA claims.  The court then discusses the effect of the Supreme Court's recent decision in *Metropolitan Life Ins. Co. v. Glenn,* 128 S. Ct. 2343 (2008) and the Eleventh Circuit's response to the Supreme Court's holding in that case.

### 1.   Three levels of scrutiny prior to *Glenn*

ERISA lacks a statutory standard of review under which district courts must review an administrator's decision to deny benefits, but the Supreme Court identified the appropriate standard of review for such cases in *Firestone Tire & Rubber Co. v.*

*Bruch*, 489 U.S. 101 (1989). The Court in *Bruch* held that a *de novo* standard of review should be applied when a plan administrator lacked discretion, but if the administrator had been vested with discretionary powers, then the decision should be subject to a "deferential" standard of review. *Id.* at 954-956. Additionally, if an administrator operates under a conflict of interest when it has been vested with discretion, then the conflict of interest must be considered as a "factor in determining whether there has been abuse of discretion." *Id.* at 115.

Applying the guidelines set by the Supreme Court in *Bruch*, the Eleventh Circuit recognized that the "deferential" review due to the decision of an administrator vested with discretion meant that the decision should not be overturned unless "arbitrary and capricious." *Jett v. Blue Cross & Blue Shield of Alabama, Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989) (equating the arbitrary and capricious standard with an abuse of discretion standard). This highly deferential standard of review creates a strong preference in favor of a plan administrator's findings; these decisions cannot be overturned if they are reasonable. *See HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 995 (11th Cir. 2001) (citing *Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1568 (11th Cir. 1990) (the same)).

When a conflict of interest exists, courts in the Eleventh Circuit until recently

14

applied a so-called "heightened arbitrary and capricious" standard. *See Brown*, 898 F.2d at 1566-1567. This standard employed a burden-shifting approach under which, "when a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest." *Id.*

This "heightened" level of scrutiny applied regardless of whether the dispute turned on a question of fact or on the proper construction to be given the language of the plan. *See Torres v. Pittston Co.*, 346 F.3d 1324, 1329 (11th Cir. 2003).

To summarize, under its framework prior to the Supreme Court's decision in *Glenn*, the Eleventh Circuit employed three differing levels of scrutiny: "(1) *de novo* where the plan does not grant the administrator discretion[;] (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest." *Shaw v. Connecticut General Life Ins. Co.*, 353 F.3d 1276, 1282 (11th Cir. 2003) (quoting *HCA Health Servs. of Ga.,* 240 F.3d at 993; *Buckley v. Metro. Life*, 115 F.3d 936, 939 (11th Cir.1997)).

In applying these three standards of scrutiny, the Eleventh Circuit developed the following framework by which district courts could analyze a plan administrator's

decision:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" ( i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision in fact is " *de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is " *de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

> (5) If there is no conflict, then end the inquiry and affirm the decision.

> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it."

*Williams v. BellSouth Telecommunications, Inc.*,  373 F.3d 1132, 1138 (11th Cir. 2004).

### 2.    *Glenn* and its interpretation in the Eleventh Circuit

Recently, the Supreme Court issued an opinion that substantially changed the above framework.  In *Metropolitan Life Insurance Co. v. Glenn*, the Supreme Court implied that certain portions of the Eleventh Circuit's six-step analysis were incorrect.

128 S. Ct. 2343 (2008).

In facts not unlike the ones presently before this Court, Glenn, a Sears employee, was denied long term benefits after having received short term benefits for the previous twenty-four months. *Id.* at 2347. The plan administrator, MetLife, was responsible for both making the decision to grant or deny benefits and payment of any benefits granted. *Id.* Glenn argued that an administrator who bears responsibility for both evaluation and payment of claims faced a conflict of interest. *Id.*

Prior to reaching the Supreme Court, the Court of Appeals for the Sixth Circuit set aside MetLife's denial of benefits based on a finding that a conflict of interest existed and that it was to be treated "as a relevant factor" under the deferential abuse of discretion standard. 461 F.3d 660 (6th Cir. 2006).

The Supreme Court affirmed the Sixth Circuit's decision. In doing so, it recognized (1) that a plan administrator with discretionary authority over evaluation and payment faces an inherent conflict of interest, 128 S. Ct. at 2349-2350, and (2) "that a conflict should be weighed as a factor in determining whether there is an abuse of discretion." *Id.* at 2351 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)) (internal quotations marks omitted). Especially important to the current case is the effect of the Court's holding as to the second issue.

The Court first determined that a conflicted administrator should still be given

a deferential standard of review.   128 S. Ct. at 2351("We do not believe that *Firestone's* statement implies a change in the standard of review, say, from deferential to *de novo* review. Trust law continues to apply a deferential standard of review to the discretionary decisionmaking of a conflicted trustee, while at the same time requiring the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion.").

The Court further cast doubt on the use of a heightened standard of review for conflicts of interest when it concluded, "[n]either do we believe it necessary or desirable for courts to create special burden-of proof rules, or other special procedural or evidentiary rules focused narrowly upon the evaluator/payor conflict.  In principle, as we have said, conflicts are but one factor taken among many that a reviewing judge must take into account."  *Id.* at 2351.  The Court further noted that

> [S]pecial procedural rules would create further complexity, adding time and expense to a process that may already be too costly for many of those who seek redress . . . . We believe that *Firestone* means what the word "factor" implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one . . . . [A conflict of interest], should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. . . . It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and

> to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Id.* at 2351.

The Eleventh Circuit confirmed the effect of *Glenn* recently when it vacated its previous opinion in *Doyle v. Liberty Life Assurance Co.*, 511 F.3d 1336 (2008), and substituted a new opinion addressing the effect of *Glenn*. --- F.3d ---, No. 07-10348, 2008 WL 4272748 (11th Cir. Sept. 18, 2008).  In *Doyle*, the plaintiff had initially been granted short-term disability benefits (STD) by her plan administrator but had been denied long-term disability (LTD) benefits.  *Id.* at *1-2.  The insurer and plan-administrator denied her claim for LTD benefits because it determined, based on a review of medical evidence, that Doyle was still capable of performing her previous occupation.  *Id.* at *2.  After she filed a lawsuit in federal court, the district court granted summary judgment in favor of the plan administrator.  *Id.*  In reaching this finding, the district court found that the plan administrator operated under a conflict of interest, but nevertheless determined that the decision was not tainted by such a conflict, applying a "modified" standard of review.  *Id.* at * 4.

On appeal, and after rebriefing in light of *Glenn*, Doyle argued that the district court did not place an appropriate amount of weight on the conflict of interest in

reaching its decision.  *Id.*

First, the Eleventh Circuit noted that *Glenn*, "implicitly overrules and conflicts with our precedent requiring courts to review under the heightened standard a conflicted administrator's decision." *Id.* at \*6.  In light of the changed standard, the court held "that the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Id.* at \*7.  Furthermore, it noted that "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Id.*

Applying this standard to the facts,[5] the court considered the parties' arguments.  In support of summary judgment, Liberty Life argued that its decision was not tainted by self-interest because it approved STD benefits initially for Doyle, and because it employed an independent physician to review Doyle's file. *Id.* at \*8. In response, Doyle noted that Liberty Life offered no explanation for its termination of STD benefits and that retention of an independent physician did not show a lack of bias because federal regulations required retaining an independent physician as part of an appeal. *Id.*

---

[5]  The court assumed that the decision was *de novo* wrong without analysis and proceeded immediately to whether the decision was reasonable. *Id.* at \*4-5.

The court rejected Doyle's attempt to prove that the decision was tainted by a conflict of interest. *Id.* In reaching this decision, the court noted that, under its plan, Liberty Life was not required to adequately explain why it terminated STD benefits and did not provide LTD benefits; the burden was on the plaintiff to show her entitlement. *Id.* Additionally, the regulations cited by Doyle required Liberty Life to hire an independent physician only when the decision was subject to appeal. Liberty Life had provided more independent review than was required when it hired an independent physician before making its initial decision. *Id.*

Based on these facts, the court recognized that some experts had indicated that Doyle could perform her previous occupation, while others indicated that she could not. *Id.* at *10. Facing these conflicting accounts, Liberty Life was vested with discretion to determine eligibility under the plan, and, "[b]ecause the evidence [was] close, [the court could not] say that Liberty Life abused its discretion in denying Doyle benefits." *Id.* Therefore, it affirmed the district court's grant of summary judgment. *Id.*

*Doyle* is not the only recent Eleventh Circuit decision to address the application of *Glenn* to the previous framework. The court's decision in *White v. Coca-Cola Co.*, --- F.3d ---, No. 07-13938, 2008 WL 4149706 (11th Cir. Sept. 10, 2008) also discussed the effect of *Glenn* and recognized a similar effect on conflicts

21

of interest analysis as *Doyle*.

In *White*, Coca-Cola acted as both sponsor and administrator of its plan. The beneficiary, White, challenged Coca-Cola's interpretation of an offset provision and a recoupment provision of the plan, which reduced his benefits.  *Id.* at *3.   After providing a summary of the Eleventh Circuit's previous six-step analysis, the court addressed the effect of *Glenn*, noting that "[a]lthough *Glenn* affects the sixth step of the [previous framework] *Glenn* does not alter our analysis unless Coca-Cola operated under a conflict of interest."  *Id.* at *4.   Concluding that there was no conflict of interest, the court found that Coca-Cola's decision was reasonable with respect to the offset provision and, with respect to the recoupment provision, the court found that Coca-Cola's interpretation of its plan was *de novo* right.  *Id.* at *7-10. Thus, the court addressed the effect of *Glenn*, but was not called upon to apply its changes to the court's analysis when a conflict of interest exists, as was the case with *Doyle*.

In light of *Glenn*, as interpreted by *Doyle* and *White*, the court concludes that the previous six-step analysis has now been reduced to three.   First, the court must determine whether the plan administrator's decision to deny benefits was *de novo* wrong.  Second, if the decision is *de novo* wrong, the court should determine whether the plan has vested the administrator with discretion.   Third and finally, if the

decision is *de novo* wrong <u>and</u> the administrator has discretion, the court must determine whether "reasonable grounds" supported it, applying the more deferential arbitrary and capricious standard.  In this third step, the court should consider the effect of any conflicts of interest as part of its inquiry into whether the decision was reasonable.

Having established the appropriate framework, the court now applies it to the current facts in this case.

### C.      Application of the Revised Framework to Scott's claims

#### 1.      <u>Was the decision *de novo* wrong</u>?

A decision is "wrong" if, after a review of the decision of the administrator from a *de novo* perspective, "the court disagrees with the administrator's decision." *Williams*, 373 F.3d at 1138 & n. 8. "The court must consider, based on the record before the administrator at the time its decision was made, whether the court would reach the same decision as the administrator. If the court determines that the plan administrator  was right, the analysis ends and the decision is affirmed." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) (quoting *Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1232 (11th Cir.2006)). *De novo* review "offers the highest scrutiny (and thus the least judicial deference) to the administrator's decision.  In fact, [the court] accord[s] no deference there, since no

judgment/discretion was exercised in making the determination." *Williams*, 373 F.3d at 1137.  "*De novo* review essentially requires the Court to act as an insurance adjustor and substitute its judgment for the judgment of the claim's administrator. A decision is 'wrong' if a court disagrees with the administrator's decision.  *Epolito v. Prudential Ins. Co. of America*, 523 F. Supp. 2d 1329, 1341 (M.D. Fla. 2007) (citing *Williams*, 373 F.3d at 1138)).

Although the administrator's decision is not afforded any deference under *de novo* review, under ERISA the plaintiff ultimately bears the burden to prove his or her entitlement to benefits.  *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998).  In attempting to satisfy this burden "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Additionally, while the court may consider the fact that a plaintiff receives Social Security Benefits, this fact alone is not dispositive.  *Paramore v. Delta Air Lines*, 129 F.3d 1446, 1452 (11th Cir. 1997).

After reviewing the administrative record and Prudential's basis for its decision, the Court concludes that Prudential's benefits determination was *de novo*

right.  The Court reaches this conclusion after careful review of the administrative record and the basis for Prudential's determination that Scott was not disabled within the terms of its plan.

Prudential faced conflicting opinions when making its benefits determination. On one hand, Scott's treating physicians expressed opinions that Scott was not able to work.  Dr. Aikens, his treating physician, on December 14, 2006, expressed the opinion that "[Scott] is unable to work due to [sic] he is permanently disabled." (Doc. 7, Ex. 11, PRU 000155).  Mary Hess, a nurse at Endocrine Consultants, stated on December 14, 2006, that "[Scott] has multiple medical problems that prevent him from working.  His medical conditions lead to increased fatigue, less energy and less stamina." (Doc. 7, Ex. 10, PRU 000154).  Nurse Donna Cordes, on March 7, 2007, expressed the opinion that "due to increasing shortness of breath and congestive heart failure, it is my opinion [that] Mr. Scott is unable to work a full time job."  (Doc. 7, Ex. 14, PRU 000221).

At the other end of the spectrum, the practitioners that Prudential hired expressed opinions that Scott was not disabled within the applicable definition of the plan.  Nurse Denise Chase, a Prudential employee who performed a clinical review of Scott's medical records, concluded: "Therefore, based on the available medical records, it is unclear how [Scott's conditions] are limiting his functional activities, or

that he is unable to sustain any activities." (Doc. 13, Ex. 9, PRU 000271).  Dr. Eldred

Zobl, a specialist in cardiovascular disease hired to perform an independent file

review concluded that "[t]here are a number of discrepancies estimating his ejection

fraction anywhere from 24-45%, but the activities that [Scott] is able to perform

without any cardiac symptoms would indicate that, although he does have some

impairment in his cardiac function, it is not severe and it is not preventing him from

normal activities." (Doc. 13, Ex. 12, PRU 000018).  Dr. Richard S. Kaplan, hired to

conduct an independent review of Scott's medical records, focusing on his physical

symptoms, concluded,  "Mr. Scott is not functionally impaired from a physiatric

standpoint.  There is no evidence throughout the medical records of any diagnostic

testing that occurred or any physical evaluations that show any functional loss or

deficit."  (Doc. 13, Ex. 14, PRU 000011).

Viewing these conflicting opinions and faced with the task of determining

whether Prudential reached the correct decision, the Court looks to the administrative

record.  In doing so, the Court separately addresses Scott's physical symptoms and

his cardiac symptoms.

a.    Scott's physical symptoms

Scott claims disability due to physical symptoms which include lower back

pain and knee pain. (Doc. 7, Ex. 1).  In evaluating his claim on this basis, Prudential

relied upon the independent file review of Dr. Richard S. Kaplan. (Doc. 13, Ex. 14).

Dr. Kaplan concluded that Scott's claims for lower back and knee pain were not

supported by medical evidence. (Doc. 13, Ex. 14, PRU 000011). Dr. Kaplan wrote:

> Both [Scott's] activities of daily living questionnaire and his medical records make only minimum mention of impairing chronic pain. The medical records indicate that overwhelmingly the claimant's ongoing treatment has been from a cardiac perspective. There is no indication that [Scott] has had any significant evaluation or treatment for chronic pain. In summary, Mr. Scott's self-reported pain is not consistent with physical findings or diagnostic testing.

*Id.* at PRU 000010.

The only evidence in the record that supports Scott's claim for disability based

on these physical symptoms is Scott's own affidavit (Doc. 7, Ex. 1) in which he

claims, "I am disabled due to . . . low back pain [and] knee pain," and a letter from

his attorney to Prudential, claiming, "Mr. Scott is disabled due to . . . low back pain

and knee pain." (Doc. 7, Ex. 17, PRU 00039).

Under the terms of the plan, in order to prove his claim, Scott needed to

demonstrate, "that [he] was under the regular care of a doctor . . . the date [his]

disability began . . . appropriate documentation of the disabling disorder . . . the

extent of [his] disability, including restrictions and limitations preventing [him] from

performing [his] regular occupation or gainful occupation . . . the name and address

of any hospital or institution where [he] received treatment . . . [and] the name and address of any doctor [that treated him]."  (Doc. 13, Ex. 1 at 21, PRU 000369).

Scott's affidavit and the letter from his attorney plainly do not satisfy the requirements necessary to prove his claim under the terms of the plan.  With no evidence from which to demonstrate that Scott was receiving treatment for back and knee pain, or evidence to demonstrate the disabling effects of his pain, Prudential reached the correct decision in determining that Scott had not satisfied his obligations and was therefore not disabled under the terms of the plan as to these physical symptoms.  The first mention of Scott's lower back and knee pain comes in his counsel's September 11, 2007 letter.  (Doc.7, Ex. 11, PRU 00039).  This was after Scott appealed the first decision by Prudential.  In sum, Scott complained of disabling physical symptoms only after he appealed the first decision and Scott submitted no medical records of any treatment for his pain.  Therefore, the Court finds that Scott failed to prove his claim of disabling physical symptoms.

### b.   Scott's cardiac symptoms

Scott also claims disability due to several heart-related conditions. Specifically, he claims impairment due to heart disease, diabetes, and Chronic Obstructive Pulmonary Disease (COPD).  (Doc. 7, Ex. 1). Of particular importance to the Court is the opinion of Scott's treating cardiologist, Dr. Aikens, whose records

Prudential relied upon in making its determination that Scott could perform light work.

Dr. Aikens initially noted on May 10, 2004, that Scott's heart condition should be classified as "NYHA Class II-III and functional Class III." (Doc. 7, Ex. 9, PRU 000189).    Later on May 6, 2005, Aikens submitted an Attending Physician's Statement that determined Scott was "NYHA Class III Functional Class III."  (Doc. 13, Ex. 5, PRU 000205).   Finally, on December 14, 2006, after Prudential's initial determination and during Scott's appeal, Dr. Aikens wrote a letter "To Whom It May Concern" and stated that "[Scott] has a history of congestive heart failure [NYHA] Class III-IV."[6]   (Doc. 7, Ex. 11, PRU 000155).    Thus, Dr. Aikens's NYHA assessments range from Class II to Class IV.  This range of classification varies in functional limitation from Mild (Class II) (Slight limitation of physical activity. Comfortable at rest, but ordinary physical activity results in fatigue, palpitation, or dyspnea), to Moderate (Class III) (Marked limitation of physical activity. Comfortable at rest, but less than ordinary activity causes fatigue, palpitation, or dyspnea), to Severe (Class 4) (Unable to carry out any physical activity without discomfort.  Symptoms of cardiac insufficiency at rest.  If any physical activity is

---

[6]The December 14, 2006, letter does not reference the term "functional."

undertaken, discomfort is increased).[7]

In his most recent Attending Physician's Statement,[8] besides listing Scott's NYHA Classification (Class III in this document), Dr. Aikens also indicated the level of work he believed Scott could perform, and he described his functional limitations. (Doc. 7, Ex. 6, PRU 000205).  In assessing Scott's job category, Dr. Aikens indicated that Scott could perform sedentary work by checking the corresponding box on the form. *Id.*  However, Dr. Aikens also indicated that Scott's functional abilities allowed him to lift up to ten pounds frequently and up to twenty pounds occasionally.  (Doc. 7, Ex. 6, PRU 000205).  Dr. Aikens made this indication by conspicuously circling the above-described weight restrictions under the "light work" column of the form provided by Prudential.  *Id.*  Dr. Aikens's findings that Scott could only perform sedentary work, yet could function within the ten pounds frequently/twenty pounds occasionally weight restriction are inconsistent with the definitional difference between sedentary work and light work.

Sedentary work includes "[e]xerting up to 10 pounds of force occasionally

---

[7] For a chart discussing NYHA Classification, *see* "The Stages of Heart Failure," The Heart Failure Society of America,  http://www.abouthf.org/questions_stages.htm (last visited October 20, 2008).

[8] Dr. Aikens also submitted an Attending Physician's Statement on May 3, 2004.  (Doc. 7, Ex. 3, PRU 000250).  In this statement, he indicated that Scott could perform medium work. *Id.*  However, Prudential does not appear to have relied on this earlier assessment in making its ultimate determination.

(Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently." *Dictionary of Occupational Titles*, Appx. C (4th ed. 1991).  In contrast, light work consists of "[e]xerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work." *Id.* Thus, Dr. Aikens's Attending Physician Statement states that Scott can perform sedentary work, but his functional assessment meets the definition of light work.

In its initial decision denying benefits, Prudential's disability claim manager, Camella Field, merely restated Dr. Aikens's conclusion and wrote, "[y]our cardiologist indicated that you are able to perform sedentary work activities with the ability to lift up to 20 pounds occasionally and 10 pounds frequently." (Doc. 13, Ex. 11, PRU 00314).  In contrast, Prudential's vocational specialist, Dr. Chretien, relied only on the functional assessment of Dr. Aikens, which corresponds to light work. (Doc. 13, Ex. 10, PRU 000278).  Thus, Dr. Chretien primarily cited to jobs that consisted of "light work" according to the definition provided in the Dictionary of Occupational Titles (Production Assembler, DOT Code 706.687-010; Sales Attendant, DOT Code 299.677-010; Security Guard, DOT Code 372.667.034).

However, he also cited to one job that involves the substantially more challenging medium work (Hand Packager, DOT Code 920.587-018).  (Doc. 13, Ex. 10, PRU 000278).

After Scott appealed Prudential's decision denying LTD benefits, Prudential clarified the discrepancy between the findings of its Vocational Rehabilitation Consultant and its initial benefits determination (though not with respect to the job that corresponds to medium work).  In the October 18, 2007 letter of its appeals specialist, James E. Furman.  In this letter, Furman stated that Scott could perform "light work," which "requires exerting up to 20 pounds of force occasionally, and/or up to 10 pounds frequently."  (Doc. 13, Ex. 15, PRU 00300).  Thus, Prudential ultimately found that Scott could perform light work.

Following Scott's appeal from its decision, Prudential concluded that "the physician who reviewed Mr. Scott's file opines that he is able to do all of these things with one restriction.  Mr. Scott's lifting should be limited to 20 pounds, and these restrictions are permanent." (Doc. 13, Ex. 15, PRU 000299).  This letter additionally recognized that "[Scott's] major disability was cardiac and the one that primarily determines his ability to function and his prognosis."  *Id.*

The reviewing physician that Prudential relied upon in addressing Scott's appeal was Dr. Eldred Zobl.  (Doc. 13, Ex. 12).  Dr. Zobl concluded, relying on Dr.

Aikens's assessment and other medical evidence, that Scott could "lift up to 20 pounds occasionally and 10 pounds frequently."   (Doc. 13, Ex. 12, PRU 000017).

He also described a final letter he received from Dr. Aikens, in which Aikens wrote that Scott was NYHA Class III or IV.   (Doc. 13, Ex. 12, PRU 000018). Regarding this conclusion, Zobl wrote, "[NYHA Class III] means that the claimant has symptoms with very sedentary work, and Class IV means that he is unable to do anything without symptoms. . . . It would appear from [Scott's physical activity descriptions] that he is not having any symptoms with reasonably-active activities and this would put him in Class I or at worst a Class II, but Class III does describe symptoms with activity and he has denied any symptoms with his daily activity." (Doc. 13, Ex. 12, PRU 000018).   Based on this evidence, Dr. Zobl concluded that "although [Scott] does have some impairment of his cardiac function, it is not severe and is not preventing him from his normal activities."   *Id.*   Dr. Zobl then found, "based on [my] review of the medical records, Mr. Scott is able to [sit, stand, walk, reach, lift, or carry] with one restriction.   His lifting should be limited to twenty pounds, and these restrictions are permanent." *Id.*

Later, in a supplementary statement, Dr. Zobl wrote:

> [Scott] does have comorbid conditions.  These include diabetes, hyperlipidemia, and hypertension and obesity.  These are all risk factors that impinge on the development of coronary occlusive

> disease but by and of themselves do not constitute disabling
> conditions. . . . [T]hese conditions are all under control and being
> treated and should not contribute at all to any functional
> impairment.

Based on this evidence, and applying the *de novo* standard of review, the Court finds that the administrator reached the correct decision in denying Scott's application for benefits. Prudential reached its decision by primarily relying on evidence provided by Scott's cardiologist, Dr. Aikens. Dr. Aikens's own assessments indicated that Scott could perform light work and, at the very least, sedentary work. Although Dr. Aikens subsequently concluded in his December 14, 2006 letter (Doc. 7, Ex. 11, PRU 000155) that Scott could not work due to disability, this opinion is wholly inconsistent with his previous conclusions (*see* Doc. 10, Ex. 9, PRU 000189). Moreover, Dr. Aikens's previous conclusions, and not his later statement affirming disability, were consistent with Scott's own self-reporting. (Doc. 13, Ex. 6, PRU 000196). Prudential used this evidence to reach its conclusion that Scott's cardiac symptoms demonstrated "some impairment," but that the impairment was not so severe as to render him disabled within the meaning of the plan. (Doc. 13, Ex. 15, PRU 000299). Faced with the same evidence as Prudential, the Court reaches the same conclusion.

Two Eleventh Circuit cases are helpful in reaching a decision in this case. In

34

one, the court affirmed the denial of benefits, applying the *de novo* standard, and, in the other, the court found that the decision was *de novo* wrong.

In *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132 (11th Cir. 2004), *overruled in part by Doyle v. Liberty Life Assur. Co.*, No. 07-10348, 2008 WL 4272748 (11th Cir. Sept. 18, 2008), the Eleventh Circuit applied the *de novo* standard of review following its former six-step framework and found that the administrator reached the correct conclusion.   *Id.* at 1138.   There, the plaintiff claimed disability due to depression.   *Id.* at 1133.   The plan administrator denied her application for benefits, finding that her condition did not prevent her from working, as required under the plan.   *Id.*   In reaching this decision, the administrator "reviewed the medical records of several doctors, including [the plaintiff's] own doctor . . . in making its benefits-denial decision. None indicated that [the plaintiff] was completely incapable of working."   *Id.* at 1138.   Additionally, the administrator had the plaintiff "examined by an independent medical examiner (IME) [to whom the plaintiff indicated] that she was engaging normally in the significant activities of daily living, including caring for two young children and a granddaughter, cooking all meals, performing housework, tending to finances, and attending religious services."   *Id.*   The plaintiff told the IME that she only wanted "a less stressful job" instead of claiming that she could not work.   *Id.*   Given this evidence, the court concluded:   "[W]e cannot say that

35

Kemper's no-disability determination was *de novo* wrong under the terms of BellSouth's disability plan." *Id.*

In *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321 (11th Cir. 2001), applying *de novo* review before it applied arbitrary and capricious review, the Eleventh Circuit found that the plan administrator's decision was wrong from a *de novo* perspective. *Id.* at 1326-1327. The evidence before the plan administrator at the time of its final decision was as follows. Levinson, the plaintiff, had submitted an Attending Physician's Statement from his cardiologist stating that he was totally disabled, his medical records, and an additional letter from his cardiologist stating that he could not perform the material duties of his occupation on a full-time basis. *Id.* at 1326. Reliance, the defendant, "relied upon [its] nurse's review [of Levinson's medical records] and the opinion of its claims person that Levinson was asymptomatic and not disabled." *Id.* Notably, Reliance did not rely upon "any independent medical evidence to conclude that Levinson did not meet the definition of disabled." *Id.* Additionally, Reliance's finding that Levinson was asymptomatic was not a reason for denying benefits under the policy. *Id.* at 1326-1327. In fact, Reliance "did not obtain an independent medical opinion until Levinson moved for summary judgment." *Id.* at 1326 n. 7. Given these facts, the court concluded that "Reliance's decisions on Levinson's claims were wrong from a perspective of *de*

36

*novo* review." *Id.* at 1327.

The facts in Scott's case are more like the ones in *Williams* than the ones in *Levinson*.   As in *Williams*, Scott's medical records do not indicate that he is completely incapable of working.  Indeed, Scott's primary physician, Dr. Aikens, has indicated that Scott could work, albeit with some discrepancy between whether that indication means that Scott could perform light work or sedentary work.  Also as in *Williams*, Scott's own admissions through his Activities of Daily Living statement indicate that he is able to perform activities that would require no greater level of exertion than would working.

The facts of this case are unlike those in *Levinson*.  There, the administrator did not rely on any independent medical evidence to reach its conclusion that the claimant was not disabled.  Prudential's decision, in contrast, is supported by Scott's own self-reporting, the reporting of his treating physician, and review by an independently hired physician.   Thus, considering previous decisions rendered by the Eleventh Circuit from a *de novo* review standpoint, the Court concludes that Prudential reached the correct decision in denying Scott's application for benefits.

        c.     The effect of Scott's disability determination under the Social Security Act.

The Eleventh Circuit has noted that the approval of disability benefits by the

Social Security Administration is not dispositive as to whether a claimant satisfies the requirements for disability under a plan covered by ERISA. *See Whatley v. CNA Ins. Co.*, 189 F.3d 1310, 1314 n. 8 (11th Cir. 1999) ("We note that the approval of disability benefits by the Social Security Administration is not considered dispositive on the issue of whether a claimant satisfies the requirement for disability under an ERISA-covered plan."); *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 n. 5 (11th Cir.1997) ("Although a court may consider this information in reviewing a plan administrator's decision regarding eligibility for benefits under an ERISA-governed plan, an award of benefits by the Social Security Administration is not dispositive of the issue before us.") (citations omitted).   Additionally, the Supreme Court has explained that there are "critical differences between the Social Security disability program and ERISA benefit plans." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003). "In determining entitlement to Social Security benefits, the adjudicator measures the claimant's condition against a uniform set of federal criteria.  The validity of a claim to benefits under an ERISA plan, on the other hand, is likely to turn, in large part, on the interpretation of the terms in the plan at issue." *Id.* at 823.

Thus, while the Court does recognize that Scott has been determined to be disabled according to an ALJ under the Social Security Act, the Court does not

consider this evidence to be so persuasive that it changes its conclusion that Prudential's denial of benefits was *de novo* right.

Therefore, because the Court finds under the *Williams* framework, as modified by *Glenn* and *Doyle*, that Prudential's decision was *de novo* correct, its analysis is concluded.  373 F.3d at 1138.  The Court need not determine whether the plan documents vest Prudential with discretion, and if so, whether Prudential's decision was arbitrary and capricious.  *Id.*  Thus, because Prudential's denial of benefits was *de novo* correct, Prudential's Motion for Summary Judgment (Doc. 11) is due to be **GRANTED**.

### d.    Prudential does not bear the burden of proof.

In reaching its conclusion, the Court has considered, and rejected, to Scott's argument that Prudential bears the burden of proving that Scott was not disabled. (Doc. 8 at 14).  In his brief, Scott cites to *Levinson v. Reliance Std. Life Ins. Co.*, discussed *supra*, as the sole case in support of his argument that "[w]hen a receipient of disability benefits submits credible medical proof of continuing disability under the plan, the burden of proof shifts to Defendant to produce medical evidence that the recipient is no longer disabled."  (Doc. 8 at 14).

In *Levinson,* the court found that Reliance's decision was wrong from a *de novo* standard as well as the more deferential arbitrary and capricious standard.  245

39

F.3d at 1327.  Having reached this conclusion, the court then turned to Reliance's argument that the district court had improperly required it prove that Levinson was disabled, since it had never determined him to be disabled in the first place.  *Id.* at 1330-1331.

> Reliance contends that <u>when the court found that Levinson was disabled</u>, it wrongly switched the burden to Reliance to prove Levinson was no longer disabled in order to end benefits . . . . Levinson submitted documents in this litigation that showed he still had a heart condition that two physicians agreed precluded him from performing the material duties of his occupation on a full-time basis. Thus, he submitted proof that he was still "Totally Disabled" under Reliance's plan. <u>Because Levinson satisfied his obligations under the terms of the plan, Reliance had to produce evidence showing that Levinson was no longer disabled in order to terminate his benefits</u>.

*Id.* at 1331.  (emphasis added). This holding was in light of the specific language of the policy at issue, which required "[u]nder the language of the plan, once Levinson became eligible for monthly benefits, those benefits would not terminate until 'the date [he] ceases to be permanently disabled,' or 'the date [he] fails to furnish the required proof of Total Disability.'"*Id.* at 1329.  Having demonstrated <u>under the terms of his plan</u> that he was disabled, Reliance was required to show that he was no longer disabled.  Thus, *Levinson*'s use of a burden-shifting approach is limited to its facts.

The Eleventh Circuit has not revisited the language it used in deciding this portion of *Levinson*, but several district courts in this circuit have.  For instance, in

*Onofrieti v. Metropolitan Life Ins. Co.*, 320 F. Supp. 2d 1250 (M.D. Fla. 2004), the

plaintiff advanced the same burden-shifting argument as Scott now does. *Id.* at 1254.

("Relying on [*Levinson*], Plaintiff argues that Defendant bears the burden of

demonstrating that Plaintiff is not disabled under the terms of the plan, because

Plaintiff received benefits for several years.").   The district court rejected this

argument, because "[t]he *Levinson* court shifted the burden to the defendant to show

that the plaintiff was not [sic] longer disabled, but the court did so not because the

defendant had been paying benefits previously, but because the plaintiff had

presented evidence that he met the definition of disabled under the plan." *Id.*

Similarly, in *Barchus v. Hartford Life and Accident Ins. Co.*, 320 F. Supp. 2d

1266 (M.D. Fla. 2004), the plaintiff advanced the same argument based on *Levinson*.

*Id.* at 1286.   As in *Onofrieti*, the district court rejected this argument, noting

"[c]ontrary to the Plaintiff's contentions, the Eleventh Circuit's decision in [*Levinson*]

does not stand for the proposition that once benefits are approved, the burden shifts

to the claims administrator to establish that the claimant is no longer 'totally

disabled.'" *Id.* at 1286-1287.  It further reasoned, "[in *Levinson*], the court concluded

that the claimant met his initial burden under the policy of establishing his total

disability and that, consequently, the defendant was required to produce evidence that

the claimant was no longer disabled in order to justify its decision to deny benefits."

41

*Id.*  Applying this reading of *Levinson*, the court rejected the plaintiff's argument because the defendant had subsequently determined that the plaintiff did not show total disability under the plan (even though it had initially determined the plaintiff to be totally disabled) and because the claims administrator did not simply re-evaluate the same evidence in making its subsequent decision, but instead considered new evidence.  *Id.*

Finally, as an additional point of comparison, the court in *Salter v. Continental Casualty Co.*, No. 5:03-CV-221-DF, 2004 WL 5573421 (M.D. Ga. Oct. 29, 2004), applied *Levinson* in the same manner as the courts in the above cited decisions.  The court recognized that "[*Levinson*'s] burden-shifting framework would be appropriately applied after a determination by this Court that Defendant's decision to deny Plaintiff LTD benefits under an 'any occupation' standard was arbitrary and capricious."  *Id* at *6.  Because the plaintiff never met her burden under the "any occupation" standard (a standard similar to the one Scott must meet under the terms of his plan in order to receive LTD benefits) and the court had not found the administrator's decision to be arbitrary and capricious, the court rejected the argument.  *Id.*

This Court reaches the same conclusion as the three above-cited district court decisions.  *Levinson* does not apply to the instant case.  Unlike the plaintiff in that

case, Scott has not demonstrated that he is entitled to receive benefits under the plan. He has not met the "unable to perform the duties of any gainful occupation" standard. Additionally, *Levinson* turned on the plaintiff's satisfying the term "total disability" within the meaning of his particular plan and, upon this showing, the plan contractually required the administrator to demonstrate that the plaintiff ceased to be permanently disabled. 245 F.3d at 1329.  Finally, *Levinson*'s use of burden-shifting and the refusal to engage in burden-shifting in the three cited district court cases all occurred when the court applied the arbitrary and capricious standard, and not the *de novo* standard, which occurs at a different stage of the *Williams* framework, as modified by *Glenn* and *Doyle*.  Thus, *Levinson*'s use of burden-shifting does not apply in this case.

## VI.   CONCLUSION

Consistent with the reasons discussed in this Memorandum Opinion, Prudential's Motion for Summary Judgment (Doc. 11) is due to be **GRANTED** and Scott's Motion for Summary Judgment (Doc. 7) is due to be **DENIED**.  The decision to deny benefits was not *de novo* wrong.  An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this the 30th day of October, 2008.

**VIRGINIA EMERSON HOPKINS**
United States District Judge